UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| **HALEY MASSUNG**, ) | |
| ) | CASE NO.: |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| **ROGER A. YOUNG**, individually and ) | |
| in his official capacity as ) | |
| Executive Director of the Florida Fish ) | |
| and Wildlife Conservation Commission, ) | |
| ) | |
| Defendant. ) | |

# <u>COMPLAINT</u>

Plaintiff HALEY MASSUNG brings this suit pursuant to 42 U.S.C. §1983, seeking declaratory and injunctive relief against Defendant, ROGER A. YOUNG, individually and in his official capacity, for violation of her First and Fourteenth Amendment rights. Plaintiff also demands damages against the Defendant, in his individual capacity, for losses occasioned by his unconstitutional retaliation against her in violation of the First Amendment.

## <u>JURISDICTION</u>

1. This suit is brought pursuant to 42 U.S.C. §1983:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia,

subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

2.      This Court has "Federal Question" jurisdiction pursuant to 28 U.S.C. §1331 to hear cases arising under the Constitution of the United States, under 28 U.S.C. §1343(3) to redress the deprivation under color of state law of any right, privilege or immunity secured by the Constitution and under 28 U.SC. §1343(4) to secure equitable relief or other relief for the protection of civil rights.

3.      The Court has the authority to issue declaratory judgments and permanent injunctions pursuant to 28 U.S.C. §§2201 and 2202, and Rule 65, Fed.R.Civ.P.

4.      The Court may enter an award of attorney's fees pursuant to 42 U.S.C. §1988.

5.      This Complaint seeks declaratory and injunctive relief to prevent violations of the Plaintiff's rights, privileges and immunities under the Constitution of the United States and Title 42 U.S.C. §§1983 and 1988, specifically seeking redress for the deprivation under color of state statute, ordinance, regulation, custom or usage of rights, privileges, and immunities secured by the Constitution and laws of the United States. The rights sought to be protected in this cause of action arise and are secured under the First and Fourteenth Amendments to the Constitution.

6.     This action seeks a judicial determination of issues, rights and liabilities embodied in an actual and present controversy between the parties involving the constitutionality of certain policies and practices of the Defendant. There are substantial *bona fide* doubts, disputes, and questions that must be resolved concerning the Defendant's actions taken under color and authority of "state" law and procedures, in violation of Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution.

## VENUE

7.     Venue is proper in the Northern District of Florida, Tallahassee Division, since Defendant is situated in Tallahassee, and all of the actions complained of occurred within the district and geographical area assigned to the Tallahassee Division.

## THE PARTIES

8.     Plaintiff HALEY MASSUNG (hereinafter "Massung" or "Plaintiff") is an individual, *sui juris*, residing in Marion County, Florida.

9.     Defendant, ROGER A. YOUNG ("Young"), is the Executive Director of the Florida Fish and Wildlife Conservation Commission ("FWC"). In that capacity, Young is responsible for carrying out all statutes and regulations within the jurisdiction of the FWC. Young is also ultimately responsible for all personnel decisions involving employees of the FWC, including the Plaintiff herein. Young is

Page 3 of 4

sued both in his individual and official capacities.

10. Plaintiff began her employment with Florida Fish and Wildlife Conservation Commission at the age of twenty and spent her entire ten-year career at that Agency.

11. Plaintiff started at FWC in November of 2016 as a Duty Officer. She was an exemplary employee and was quickly promoted to Duty Officer Specialist, followed by another promotion to Senior Duty Officer – a position she held for more than a year before her termination.

12. Duty officers (also referred to as "dispatchers") hold a civilian position at FWC. They interact with sworn law enforcement officers, providing dispatch, monitoring and coordination services for those officers.

13. Plaintiff excelled at her job and was respected by her peers. Plaintiff was Duty Officer of the year for FWC in 2018.

14. Prior to the events complained of in this lawsuit, Plaintiff had never previously been subject to formal discipline during her long tenure at FWC

15. Plaintiff's work at FWC represented not just a livelihood, but a career and a calling.

**<u>COLOR OF STATE LAW</u>**

16. As a public official and Director of a state agency, Defendant and his agents, were, and are, acting under color of state law and authority.

17.    Defendant's actions, taken under color of state law, violate Plaintiff's constitutional rights to engage in free speech.

### PLAINTIFF'S SOCIAL MEDIA POST

18.    Charlie Kirk was a well-known and polarizing political figure in the United States. He was the co-founder of Turning Point USA, a conservative group which was especially known for outreach to college students. Mr. Kirk frequently spoke and debated on college campuses vigorously exercising his right of free speech.

19.    Mr. Kirk was killed on September 10, 2025, while giving a speech on a college campus.

20.    Mr. Kirk was a public figure widely known for his controversial political views, and his death was and is a matter of public concern. At the time Plaintiff responded to a post on social media concerning Charlie Kirk. Mr. Kirk's killing was *the* topic of discussion across the nation. The President and much of his cabinet attended Mr. Kirk's memorial along with some 90,000 of his followers.[1] Mr. Kirk's legacy remains a point of contention among both politicians and citizens in Florida and everywhere else in the country.

---

[1]    *See,*    https://www.foxnews.com/politics/charlie-kirk-honored-90k-one-largest-memorials-private-citizen (last accessed 6/14/26).

21.    People on social media almost certainly encounter speech about Charlie Kirk that they find to be despicable, no matter where they fall on the political spectrum. That is the nature of a democracy where free speech is protected. And just as political violence has no place in a just society, the unbridled trampling of constitutional protections has no place either. One of the outcomes of the tragedy of Mr. Kirk's death has been a tremendously increased fervor for censorship. Indeed, government actors at all levels have called for Americans to lose their jobs and livelihoods because they exercised their right to freely express political views that are controversial - a right Mr. Kirk himself exercised and encouraged for others. Yet the basic freedom to talk about the biggest public issues of the day, and to debate and even condemn the political views of others, is fundamental to our democracy. And that is the basic freedom that Defendant has denied to Plaintiff.

22.    It is known that at least three individuals employed by FWC posted political statements concerning Mr. Kirk's death on various social media platforms: Brittney Brown, Taylor Ozimek and Plaintiff, Haley Massung.

23.    From time to time, Plaintiff has engaged on a third-party Facebook page known as "Velvet Guillotine". Velvet Guillotine is a private, invitation-only page/group that was created specifically to discuss controversial political and social topics.

24.    Following his death, many people posted comments on Velvet Guillotine critical of Mr. Kirk's positions on social and political matters and his religious and political activism.

25.    A day or two after Mr. Kirk's death (within the September 11 -12th timeframe), Plaintiff posted a response to a running series of comments concerning Mr. Kirk. Plaintiff's post appears below:



26.    The post made immediately before Plaintiff's comment was obviously a play on the phrase "rest in peace". Plaintiff joined in with the same slightly off-color remark, replacing "peace" with "p!ss" and including an emoji intended to convey a note of sarcasm and disdain.

27.    Plaintiff understood the comment preceding hers to be an expression of opposition to Mr. Kirk's policies and actions during his life. Plaintiff's reply was intended to voice the same position; essentially a suggestion that Mr. Kirk's policies and actions had a negative impact on society and that there should be "no rest for the wicked".

28.    Plaintiff's political statement does not condone Mr. Kirk's killing; nor does it condone violence or call for further violence.

29.    No one replied to or commented on Plaintiff's post on the Velvet Guillotine page.

30.    Plaintiff accessed the Velvet Guillotine page on her own time using her own device. Similarly, Plaintiff responded to the original p!ss post on her own time using her own device.

31.    Plaintiff's reply on the Velvet Guillotine page had nothing to do with her job responsibilities or her employment with FWC. Plaintiff was not purporting

to speak for or on behalf of the FWC; the text and circumstances show that Plaintiff was making a purely personal political statement unconnected with her employer.

32.    Plaintiff did not identify herself as an employee of FWC on the Velvet Guillotine page or in her post. Accordingly, it is unknown how anyone made or could have made the connection between Haley Massung, the social media speaker, and Haley Massung, the employee of FWC.

33.    Plaintiff's political post is fully protected by the First Amendment to the United States Constitution, made effective against the States through the incorporation doctrine of the Fourteenth Amendment.

34.    Political speech on matters of public interest and concern lies at the core of the First Amendment.

35.    Plaintiff's post does not fall within any of the narrow categories of speech which are excluded from the protection of the First Amendment:[2]

A.    Plaintiff's post did not pose any risk of imminent incitement to lawless action and did not include any "fighting words"; it was a political statement disseminated by way of the Internet; was not directed at any particular person or group; did not employ any racial slurs; was sent under calm circumstances; and did

---

[2] *See generally*, United States v. Stevens, 559 U.S. 460, 468–69 (2010); Counterman v. Colorado, 600 U.S. 66, 73–74 (2023).

not call for the commission of any violent act.

B.   Plaintiff's post was not a true threat; the post did not threaten anyone but merely stated a political opinion about a political figure.

C.   Plaintiff's post was not obscene in whole or in part; the post does not depict or describe any sexual act that might appeal to the prurient interest.[3]

D.   Plaintiff's post was not defamatory in whole or in part; the post represented a pure political opinion which cannot be proven true or false and which contained obvious elements of rhetorical hyperbole.

E.   Plaintiff's post was not associated with any criminal conspiracy and was not integral to criminal conduct; no crime was suggested, contemplated, or associated with this political post.

F.   Plaintiff's post was not involved in any fraud and did not propose any fraudulent transaction; the post was a noncommercial political statement.

---

[3]   There was a time long ago when "piss" was one of the "seven dirty words" one couldn't say on broadcast television. *See*, 7 Words Extended Version | George Carlin | Again! (1978) accessible at 5:24 in recording posted at https://www.youtube.com/watch?v=1rP-U-ZbuzE&list=PL2AO4_ZVyGMxK50AprEzpwpJ2dkJYkqEH (last accessed 6/14/26). In modern times, the word is used in casual conversation and even our country's President uses it in public interviews. *See, e.g.*, https://www.axios.com/2026/06/14/trump-netanyahu-iran-deal-israel-beirut-strike ("Why did Bibi have to do a fucking attack? I was so pissed off."). (last accessed 6/14/26). In testimony given in the case of <u>Brittney Brown v. Roger A. Young, et al</u>, Case No.: 4:25-cv-419 (N.D. Fla.), Defendant stated that an employee was not subject to termination for including the word "piss" in a social media post.

G.      Plaintiff's post did not invade any registered copyright, trademark or patent or otherwise infringe anyone's intellectual property rights.

H.      Plaintiff's post was not treasonous or a call for insurrection, nor did it betray any state secrets or threaten the nation's security.

## BRITTNEY BROWN SOCIAL MEDIA POST; TERMINATION AND LITIGATION

36.     On Saturday evening, September 13, 2025, Defendant Young became aware of a social media post by Brittney Brown, a biologist employed by FWC. The Brown post was initially discovered by Defendant's wife while she was browsing her social media account.

37.      Like Plaintiff's social media post, Ms. Brown's post was critical of Charlie Kirk and did not express remorse for his death.

38.     Defendant Young objected to the content of Brittney Brown's social media post and the viewpoint expressed in her post.

39.     Director Young believed that a social media post which did not specifically object to Mr. Kirk's killing was essentially advocating for political violence. In testimony Defendant Young gave later in litigation brought by Brittney Brown, he expressed his objections to the Brown post in the following terms:

A.      Well, if you're not - if you're not against it, then in my mind, you're advocating for it. I mean, if you're not going to - if you're going to discuss it and you're not discussing how horrible it is for someone

else to - for another human being to be killed on television or on social media in front of others, then in a sense, you must be advocating for it.

40.   Director Young made the decision to fire Brittney Brown on the evening of September 13, 2025, or on the following day, Sunday, September 14, 2025.

41.   FWC publicly announced its opposition to the content of Brittney Brown's social media post in two press releases issued at the direction of Defendant Young:

A.   On Sunday evening, September 14, 2025, FWC posted the following statement: "We've been made aware of an FWC employee's recent social media post and we do not condone nor tolerate this type of hateful sentiment. We're actively working towards a swift and immediate resolution regarding this individual's employment." This statement was posted officially through the FWC X account[4]:



_____

[4] https://x.com/MyFWC/status/1967356249022009566  (last accessed 6/17/26).

B.     On the following day, Monday, September 15, 2025, FWC issued another press release announcing that Brittney Brown had been fired stating:

> This weekend, we were made aware of a deeply troubling incident involving an FWC employee who shared a social media post that made light of the assassination of Mr. Kirk. The comments and actions of this individual are not in line with the FWC, our values, or our mission. We have a zero-tolerance policy towards the promotion of violence and hate, and we will not stand for such behavior. Upon learning of the social media post, FWC leadership took swift action, terminating the individual. We expect all our employees to conduct themselves with the utmost professionalism and always keep the public's trust in mind.

Again, FWC posted that statement through its official X account:[5]



42.     The Brittny Brown social media post had caught the attention of a conservative group known as "Libs of Tik Tok" which identified Brittney Brown as

---

[5]  https://x.com/MyFWC/status/1967618398873084198 (last accessed 6/17/26).

an FWC employee and demanded that she be fired. That social media campaign ultimately generated approximately 50 email complaints directed to FWC.

43. Brittney Brown ultimately sued Defendant Young in the case styled Brittney Brown v. Roger A. Young, et al, Case No.: 4:25-cv-419 (N.D. Fla.).

44. During the course of the Brown litigation, the Defendants filed a Declaration claiming that FWC had received "hundreds" of complaints from "citizens, volunteers, and partner organizations" reacting to the Brown social media post and expressing "concern or outrage". The Declaration further claimed that "[t]he volume and tone of these communications disrupted agency operations, required diversion of staff resources to manage responses, and raised legitimate concerns about the agency's credibility and public trust."

45. None of that was true. This Court ultimately found that the Declaration amounted to a fraud on the Court and imposed sanctions against one of the Defendants and her counsel. *See*, ECF 59, 73, Brown, Case No.: 4:25-cv-419 (N.D. Fla.).

46. The Brown litigation ultimately settled for $485,000 and other relief.

**TAYLOR OZIMEK SOCIAL MEDIA POST AND TERMINATION**

47. On or about September 11, 2025, the FWC received an anonymous complaint on its website concerning Taylor Ozimek, a regional biologist employed by FWC. The complaint read as follows:

Page 14 of 15

Taylor Ozimek saying that the death of Charlie Kirk is 'Worth it' is disgustingly inhumane and a bad look for the Florida Fish & Wildlife Conservation Commission. Please have your people do better.

48.     The anonymous complaint was accompanied by a screen shot of a social media post allegedly made by Taylor Ozimek in response to a report on Charlie Kirk's killing. That post allegedly read:

As Charlie Kirk once said... Worth it.

49.     On September 15, 2025 - OIG issued a written report documenting the complaint from that single anonymous individual. The report was forwarded to Melissa Tucker, head of the FWC's Division of Habitat and Species Conservation. A copy was simultaneously sent to Defendant Young.

50.     At the time Defendant Young received the OIG report concerning Taylor Ozimek, he had already made the decision to terminate Brittney Brown.

51.     Unlike Brittney Brown's social media post, Taylor Ozimek's post did *not* attract the attention of Libs of Tik Tok or any other social media or advocacy group.

52.     Unlike Brittney Brown's social media post, Taylor Ozimek's post did *not* generate any email complaints other than the single anonymous individual.

53.     Taylor Ozimek's social media post concerning Charlie Kirk did not result in any disruption in FWC's normal operations.

54.     Defendant Young objected to the content of Taylor Ozimek's social media post and the viewpoint expressed in her post.

55.     Defendant Young terminated Taylor Ozimek's employment with FWC as a direct response to Ms. Ozimek's social media post concerning Charlie Kirk and for no other reason.

56.     Defendant Young terminated Taylor Ozimek's employment with FWC at approximately the same time as he terminated Plaintiff's employment.

## PLAINTIFF'S TERMINATION

57.     On September 15, 2025, the FWC Office of Inspector General ("OIG") received two anonymous contacts on its website from a single individual complaining about Plaintiff's social media post. The complaint read as follows:

> I have two photos but am able to only upload one. I'd rather stay anonymous but to see so much hate being displayed over the Charlie Kirk, baffles me! Please look into Haley. The hate has to stop! Do not let someone who represents you, celebrate a death as if the individual did not matter!

> Attached is the 2nd photo to show which post, [sic] she [Massung] said 'rest in p!ss [smiley emoji] on.

58.     OIG conducted research through publicly available sites which confirmed that Plaintiff was an FWC employee.

59.     On that same date – September 15, 2025 - OIG issued a written report documenting the complaint from that single anonymous individual. The report was

forwarded to then-Colonel Smith for management action with a copy to Defendant Young. A copy of the September 15, 2025 OIG report is attached as Exhibit "1" to this Complaint.

60.    At the time Defendant Young received the OIG report, he had already made the decision to terminate Brittney Brown.

61.    Unlike Brittney Brown's social media post, Plaintiff's post did *not* attract the attention of Libs of Tik Tok or any other social media or advocacy group.

62.    Unlike Brittney Brown's social media post, Plaintiff's post did *not* generate any email complaints other than the single anonymous individual.

63.    Defendant Young terminated Plaintiff's employment with FWC as a direct response to Plaintiff's social media post concerning Charlie Kirk and for no other reason.

64.    Plaintiff received notice of her termination on or about September 18, 2025.

65.    The termination notice was delivered by the Tallahassee Center Manager, Rachel Popper and the Duty Officer Supervisor, Joann Taylor. One or both of those officials told Plaintiff that she was fired because of her social media post concerning Charlie Kirk and for no other reason. Both women were distraught and crying when they delivered the termination notice because they valued Plaintiff as a co-worker and were aware of her unblemished employment record at FWC.

66.     Upon delivery of the termination notice, Plaintiff was immediately suspended from work without pay (although she was able to make use of her annual leave while on suspension).

67.     Prior to her termination, none of Plaintiff's co-workers had expressed any concern or opposition to her social media post concerning Charlie Kirk. To the contrary; all of Plaintiff's colleagues and co-workers expressed support for her and were extremely disheartened to learn that she had been terminated.

68.     Plaintiff requested a termination hearing. That hearing was presided over by Colonel Smith, but the final termination decision was made by Defendant Young.[6]

69.     Plaintiff's termination was upheld with an official final date on or about September 26, 2025.

---

[6] Young testified as follows in his deposition in the Brown litigation regarding Plaintiff's termination:

Q.     And who made that termination decision?

A.     It was made from the division of law enforcement, but they referred to me before final decision, so...

Q.     Okay. And so what does that mean as to – you know, when we say who -- the buck stops here, who made that decision?

A.     I -  I made the final decision.

70. Defendant terminated Plaintiff solely because he objected to the content and viewpoint of Plaintiff's social media post and for no other reason.

71. Defendant specifically object to the viewpoint expressed by Plaintiff: indifference to Mr. Kirk's killing. That viewpoint-based discrimination is demonstrated by the following:

A. Defendant has not terminated anyone for publicly mourning Mr. Kirk's death or lauding his political activism.

B. In its public statement, the FWC claimed that Plaintiff's post is "not in line" with the agency's "values".

72. Defendant's actions here were based on his opposition to the content and viewpoint of Plaintiff's speech and not based on any good faith belief that Plaintiff's post would disrupt the ability of the FWC to function, upset its ability to deliver state services, or lead to dissension in the office. Plaintiff alleges the following particulars:

A. At the time Plaintiff was formally terminated - September 26, 2025 – FWC had experienced no actual disruption in its operations and had devoted no money or resources to addressing any public fallout associated with Plaintiff's post. Furthermore, there was no reasonable basis to conclude that any public outcry would take place in the future given the passage of time and actual experience.

B.     Defendant's decision to suspend and then terminate Plaintiff came at a time when none, or practically none, of Plaintiff's colleagues were even aware of the post. Those few who were aware of the post were supportive of the Plaintiff and none complained to her or her superiors about the post.

C.     Plaintiff continues to receive support and cordiality from her colleagues.

D.     Defendant Young testified in the <u>Brown</u> litigation that he terminated Plaintiff "in terms of consistency" because he had decided to terminate Brittney Brown and Taylor Ozmiek in response to their Charlie Kirk posts.

E      FWC had no formal policies governing the private social media activities of its employees at the time Plaintiff made her Charlie Kirk post.

73.     Instead of supporting Plaintiff's First Amendment rights, and those of other dissenting individuals, Defendant Young rushed to capitulate to the Libs of TikTok heckler's veto and make a political example of three of FWC's employees: Brittney Brown, Taylor Ozmiek and Plaintiff, Haley Massung.

74.     Defendant's decision to terminate Plaintiff was based on objections to Plaintiff's speech. Plaintiff alleges the following particulars:

A.     Plaintiff was told of no other rationale for her termination.

B.     The information provided to her by at least one of her superiors identified Plaintiff's Charlie Kirk post as the sole reason for her termination.

C.     The timing of Plaintiff's termination leaves no doubt that it was motivated purely in response to her political statement.

D.     Defendant nowhere claims that Plaintiff's political statement actually disrupted FWC's ability to deliver services or effectively administer its programs or might reasonably do so in the future given the passage of time and actual events.

E.     Even ignoring all of the foregoing facts, FWC readily admits - and effectively brags - in its public statements that the Agency moved to identify and fire employees who were critical of Charlie Kirk.

75.     On information and belief, Defendant intended this termination to chill the future speech of all FWC employees by making a public example of Plaintiff and the two other terminated employees.

76.     There is a direct causal connection between Plaintiff's political speech and Defendant's decision to terminate her employment; the timing and substance of the FWC press statements leave no doubt.

## DEFENDANT YOUNG IS INDIVIDUALLY LIABLE FOR VIOLATING PLAINTIFF'S CONSTITUTIONAL RIGHTS

77.     Defendant Young is Plaintiff's ultimate supervisor and he is the individual who actually made the decision to terminate Plaintiff in response to Plaintiff's political post concerning Charlie Kirk.

78. Young has actual knowledge that Plaintiff was terminated solely because of objections to the content of her political post.

79. Young has actual knowledge that Plaintiff was terminated solely because of objections to the particular viewpoint expressed in her political post.

80. The law is clearly established that — where a public employee is engaging in private public speech on a matter of public concern, and where no disruption in government operations is shown — the government cannot terminate or retaliate against the employee based on the content or viewpoint of their speech. *See, e.g.*, Travers v. Jones, 323 F.3d 1294, 1295–96 (11th Cir. 2003), *citing* Rankin v. McPherson, 483 U.S. 378, 383 (1987) ("The law is clearly established that an employer may not demote or discharge a public employee for engaging in protected speech.").

81. Even if the viewpoint-based discrimination at issue in this case does not categorically preclude any claim for qualified immunity, Pickering[7] balancing would lead to the inevitable conclusion that Plaintiff's discharge was unlawful.

82. Defendant Young intentionally violated Plaintiff's First and Fourteenth Amendment rights for discriminatory and retaliatory purposes.

---

[7] Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois, 391 U.S. 563 (1968).

83.   Defendant has actual knowledge that his termination of Plaintiff in retaliation for her political speech was unlawful and in violation of Plaintiff's First Amendment rights.

## ALLEGATIONS IN SUPPORT OF INJUNCTIVE RELIEF

84.   Plaintiff's free speech has been chilled now, and in the future, as she has been deprived of her very livelihood as a consequence of her speech.

85.   Unless the actions, policies, and practices of Defendant are enjoined by this Court, Plaintiff will suffer the continuing loss of her constitutional rights.

86.   Plaintiff has suffered irreparable injury and continues to suffer irreparable injury as a result of the Defendant's actions, policies, and practices.

87.   Plaintiff will continue to suffer the violation of her First Amendment rights unless and until she is restored to her employment and position at FWC.

88.   Plaintiff does not have a plain, adequate, or complete remedy to protect her constitutional rights and to redress the wrongs and illegal acts complained of, other than immediate and continuing injunctive relief.

89.   Plaintiff does not have an adequate remedy at law. Deprivation of rights guaranteed under the Constitution is an irreparable injury for purposes of injunctive relief. In cases involving the loss of First Amendment rights, such as in this case, monetary damages are inadequate.

90.    The public interest would be served by the granting of injunctive relief. In fact, the public interest is disserved by actions, such as those of Defendant, which interfere with the public's rights guaranteed under the First Amendment.

91.    A permanent injunction will preserve Plaintiff's civil rights and will minimize the need to award extensive compensatory damages.

## DAMAGES AND ATTORNEY'S FEES

92.    Because of Defendant's actions, Plaintiff's First and Fourteenth Amendment rights have been violated and Plaintiff is faced with similar and repeated violations of her rights in the future.

93.    Plaintiff has suffered economic losses, including the lost income from employment she would have received but for her illegal and unconstitutional termination.

94.    Plaintiff has retained Benjamin, Aaronson, Edinger & Patanzo, P.A. as her attorneys to represent her in this action. Defendant is obligated to pay Plaintiff's attorney's fees pursuant to 42 U.S.C. § 1988.

## COUNT I
### First Amendment Violation - Retaliation

95.    Plaintiff realleges the facts set forth in Paragraphs 1 through 94 and incorporates those facts into this Count by reference.

96. This is an action for declaratory relief and injunctive relief brought by the Plaintiff against Defendant Young under this Court's general jurisdiction and pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983.

97. Plaintiff is uncertain as to her rights and remedies following the termination of her employment in apparent violation of the First Amendment to the United States Constitution.

98. In posting the political comment concerning the death of Mr. Kirk, Plaintiff spoke as a private citizen.

99. Plaintiff's comments concerning the death of Mr. Kirk addressed matters of public concern.

100. Defendant Young took adverse action against Plaintiff - specifically her discharge from employment and the associated wages and benefits.

101. Defendant Young had the actual authority to bring disciplinary charges against Plaintiff, including her discharge from employment.

102. Defendant Young's affirmance of his initial termination decision, following Plaintiff's request for an administrative review, gave effect to and implemented the disciplinary action against Plaintiff.

103. Defendant Young's actions directly deprived Plaintiff of her First Amendment rights.

104. Defendant Young's adverse action was in direct response to Plaintiff's protected political speech.

105. Plaintiff's political post was the motivating factor in Defendant Young's decision to take retaliatory action against Plaintiff. Defendant Young immediately terminated Plaintiff because of her private political comments on a matter of public importance.

106. Defendant Young's response to Plaintiff's expression was sufficient to deter a person of ordinary firmness from continuing to engage in expressive activity.

107. Defendant Young's actions have chilled Plaintiff's speech.

108. Defendant Young's actions were based on his objections to the content of Plaintiff's speech and the particular viewpoint expressed, all in direct retaliation for Plaintiff's speech.

109. Defendant Young's decision to terminate Plaintiff's employment was motivated by FWC's opposition to Plaintiff's viewpoint, which the FWC labeled as contrary to its "values".

110. Plaintiff is likely to succeed on the merits of her claims.

WHEREFORE, Plaintiff prays for the following relief:

A.    That this Court take jurisdiction over the parties and this cause;

B.    That this Court enter a judgment declaring that Defendant Young's decision to terminate Plaintiff's employment violated the First Amendment because it was content-based;

C.    That this Court enter a judgment declaring that Defendant Young's decision to terminate Plaintiff's employment violated the First Amendment because it was viewpoint-based;

D.    That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her associated position and responsibilities;

E.    That this Court enter a judgment for front pay in the event reinstatement is not granted;

F.    That this Court enter a judgment for compensatory damages against Defendant Young, individually, to compensate Plaintiff for her lost wages and benefits;

G.    That this Court award Plaintiff nominal damages against Defendant Young, individually;

H.    That this Court award punitive damages against Young, individually, to deter the Defendant from violating Plaintiff's rights and other similarly situated employees in the future;

I.      That this Court enter a judgment for pre-judgment and post-judgment interest against Defendant Young, individually, at the highest lawful rate;

J.      That this Court award Plaintiff her recoverable costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988; and

K.      That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

## COUNT II
### First Amendment Violation - Content and Viewpoint Discrimination

111.    Plaintiff realleges the facts set forth in Paragraphs 1 through 94 and incorporates those facts into this Count by reference.

112.    This is an action for declaratory relief and injunctive relief brought by the Plaintiff against Defendant Young under this Court's general jurisdiction and pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983.

113.    Plaintiff is uncertain as to her rights and remedies following the termination of her employment in apparent violation of the First Amendment to the United States Constitution.

114.    In posting the political comment concerning the death of Mr. Kirk, Plaintiff spoke as a private citizen.

115.    Plaintiff's comments concerning the death of Mr. Kirk addressed matters of public concern.

116.   Plaintiff's interest in speaking as a private citizen on matters of public concern necessarily outweighs Defendant's interests in advancing content- or viewpoint-discrimination.

117.   Plaintiff's interest in speaking as a private citizen on matters of public concern outweighs Defendant's interest in content and viewpoint discrimination or imposing a heckler's veto.

118.   Defendant Young terminated Plaintiff's employment because of Defendant's opposition to the content of Plaintiff's political statement, or because of public reactions to Plaintiff's message, or both.

119.   Defendant Young cannot reasonably claim that Plaintiff's political speech would upset the orderly operations of the FWC, nor were such disruptions reasonably foreseeable given the limited publication of Plaintiff's private speech, the lack of knowledge by her co-workers, the innocuous content of Plaintiff's speech, the passage of time, and FWC's actual experience following the post.

120.   Plaintiff's speech did not, in fact, disrupt FWC's operations, which fact was known to Defendant Young.

121.   Public reaction to speech is never a content-neutral basis for regulation. *See*, Forsyth Cnty. v. Nationalist Movement, 505 U.S. 123, 134 (1992). A heckler's veto is a viewpoint-based limitation on expression and is impermissible under the First Amendment.

122. The First Amendment prohibits government officials from discriminating against speech "based on the ideas or opinions it conveys." <u>Iancu v. Brunetti</u>, 139 S. Ct. 2294, 2299 (2019); *See, also*, <u>Rosenberger v. Rector & Visitors of Univ. of Va.</u>, 515 U.S. 819, 828–30 (1995) (Action taken against a speaker because of "its message" is viewpoint discrimination). Viewpoint discrimination is an "egregious form of content discrimination" and is "presumptively unconstitutional." <u>Rosenberger</u>, 515 U.S. at 829–30.

123. Defendant Young's decision to terminate Plaintiff's employment is the product of viewpoint discrimination and is in retaliation for Plaintiff's speech.

124. Defendant Young's decision to terminate Plaintiff's employment was motivated by FWC's opposition to Plaintiff's viewpoint, which the FWC labeled as contrary to its "values".

125. Plaintiff is likely to succeed on the merits of her claims.

WHEREFORE, Plaintiff prays for the following relief:

A. That this Court take jurisdiction over the parties and this cause;

B. That this Court enter a judgment declaring that Defendant Young's decision to terminate Plaintiff's employment violated the First Amendment because it was content-based;

C.    That this Court enter a judgment declaring that Defendant Young's decision to terminate Plaintiff's employment violated the First Amendment because it was viewpoint-based;

D.    That this Court enter a preliminary and permanent injunction reinstating Plaintiff's employment and restoring Plaintiff to her associated position and responsibilities;

E.    That this Court enter a judgment for front pay in the event reinstatement is not granted;

F.    That this Court enter a judgment for compensatory damages against Defendant Young, individually, to compensate Plaintiff for her lost wages and benefits;

G.    That this Court award Plaintiff nominal damages against Defendant Young, individually;

H.    That this Court award punitive damages against Young, individually, to deter the Defendant from violating Plaintiff's rights and other similarly situated employees in the future;

I.    That this Court enter a judgment for pre-judgment and post-judgment interest against Defendant Young, individually, at the highest lawful rate;

J.    That this Court award Plaintiff her recoverable costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988; and

K.    That this Court award Plaintiff all other relief in law and in equity to which she may be entitled.

## **JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable as a matter of right.

BENJAMIN, AARONSON, EDINGER & PATANZO, P.A.


_/s/ Gary S. Edinger_
GARY S. EDINGER, Esquire
Florida Bar No.: 0606812
305 N.E. 1st Street
Gainesville, Florida 32601
(352) 338-4440/ 337-0696 (Fax)
GSEdinger12@gmail.com
*Attorney for Plaintiff*